IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 3, 2022

**IN RE STEPHEN H. ET AL.**

**Appeal from the Juvenile Court for Macon County**
**No. 2021-JV-108        Ken Witcher, Judge**

———————————————————

**No. M2022-00674-COA-R3-PT**

———————————————————

In this case involving termination of the father's parental rights to his children, the trial court found that several statutory grounds for termination had been proven by clear and convincing evidence. The trial court further found that clear and convincing evidence demonstrated that termination of the father's parental rights was in the children's best interest. The father has appealed. Having determined that clear and convincing evidence did not support the trial court's finding of the statutory abandonment ground of failure to support, we reverse the trial court's judgment with respect to this ground. We affirm the trial court's judgment in all other respects, including the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and JEFFREY USMAN, JJ., joined.

Jacquelyn M. Scott, Carthage, Tennessee, for the appellant, Stephen H., Sr.

Jonathan Skrmetti, Attorney General and Reporter, and Carrie Perras, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

On September 8, 2021, the Tennessee Department of Children's Services ("DCS") filed in the Macon County Juvenile Court ("trial court") a petition seeking to terminate the parental rights of Stephen H., Sr. ("Father"), the legal father of Stephen H., Jr. ("Stephen"); Aiden H.; and William H. (collectively, "the Children").[1] Stephen was born in September

---

[1] In the same petition, DCS also sought to terminate the parental rights of Brooks H., the putative father of Stephen H., Jr. However, Brooks H.'s parental rights were not adjudicated during the trial of the present

2010, William was born in August 2011, and Aiden was born in July 2012. The mother of the Children, Kristen P. ("Mother"), surrendered her parental rights to the Children on July 8, 2021, and is not a party to this appeal.

The Children have been in DCS custody since January 29, 2020, when DCS filed a petition to declare the Children dependent and neglected. In its dependency and neglect petition, DCS indicated that it had received a referral containing an allegation of "environmental neglect" on January 9, 2020. As a result, Rebecca Medeiros, a case worker with DCS, interviewed the Children, who reported to her that their home was "messy" and infested with "lots and lots of bugs." Aiden also reported domestic violence between Father and Mother, while Stephen and William reported insufficient food in the home. On January 14, 2020, Ms. Medeiros inspected the home and discovered a disarrayed, odorous home, in part due to the more than ten cats and one dog residing there and an overflowing litterbox in the Children's bedroom. According to Ms. Medeiros, there were "copious amounts of debris on the floor," a broken window, a hole in the wall, and a hole that opened up into the attic. Furthermore, at least two of the boys exhibited severe behavioral issues. On August 7, 2020, the trial court adjudicated the Children dependent and neglected due to "inappropriate lack of housing at time of removal."

DCS's filing of the dependency and neglect petition in January 2020 was not the first instance of state intervention for the family. Testimony presented at trial revealed that the Children had been removed from Mother's custody in 2016 when the family was residing in Oklahoma due to Mother's mental health issues. At that time, Father had been residing in Tennessee. The Children were returned to Mother's custody in 2017, and they moved back to Tennessee. DCS subsequently became involved with the family in August 2018 after receiving a referral concerning physical abuse by Father's wife.[2] During DCS's involvement with the family from August 2018 to June 2019, DCS received other referrals alleging lack of supervision, physical abuse, and environmental neglect. Significant financial issues also became apparent during DCS's involvement with the family during this timeframe. After arranging in-home social services to assist Mother and Father with parenting concerns and the Children with behavioral issues, DCS closed its case until it became involved again in January 2020. According to Ms. Medeiros, it had become clear that the family could not sustain itself without DCS's assistance.

In its termination petition, DCS alleged the following grounds: (1) abandonment by failure to support, (2) abandonment by failure to establish a suitable home, (3) substantial non-compliance with the permanency plans, (4) persistence of the conditions

---

case, and he is not a party to this appeal. We will focus solely on the termination of Father's parental rights in this Opinion.

[2] The trial testimony related to Father's wife refers to someone other than Mother.

- 2 -

leading to the Children's removal, and (5) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children.

Following a bench trial conducted on April 4, 2022, the trial court entered a judgment on May 16, 2022, finding that DCS had proven each of the alleged grounds by clear and convincing evidence and that termination of Father's parental rights was in the Children's best interest. The court accordingly terminated Father's parental rights to the Children. Father timely appealed.

## II. Issues Presented

Father presents the following issues for this Court's review, which we have restated slightly as follows:

1. Whether the trial court erred by finding that DCS had presented clear and convincing evidence to support statutory grounds for termination of Father's parental rights to the Children.

2. Whether the trial court erred by finding clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96,

97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).
>
> \* \* \*
>
> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

- 4 -

IV.  Statutory Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2022) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)    The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)    Termination of parental or guardianship rights must be based upon:

(1)    A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)    That termination of the parent's or guardian's rights is in the best interests of the child.

In its final judgment, the trial court found that clear and convincing evidence supported the following grounds for termination:  (1) abandonment by failure to support, pursuant to Tennessee Code Annotated § 36-1-113(g)(1) and § 36-1-102(1)(A)(i); (2) abandonment by failure to establish a suitable home, pursuant to Tennessee Code Annotated § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii); (3) substantial noncompliance with the permanency plans, pursuant to Tennessee Code Annotated § 36-1-113(g)(2); (4) persistence of the conditions leading to the Children's removal, pursuant to Tennessee Code Annotated § 36-1-113(g)(3); and (5) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children, pursuant to Tennessee Code Annotated § 36-1-113(g)(14).  We will address each respective ground found by the trial court in turn.

A.  Statutory Abandonment

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2022) provides as relevant to this action:

(g)    Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g).  The

following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

> (1)      Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Tennessee Code Annotated § 36-1-102(1)(A) (Supp. 2022) provides the following definitions of abandonment as pertinent here:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

> (i)      For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

> (ii)   (a)      The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

>      (b)      The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

>      (c)      For a period of four (4) months following the physical removal, the department or agency made reasonable

efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

### 1. Abandonment by Failure to Support

The trial court determined that Father had abandoned the Children by failing to support or make reasonable payments toward the Children's support during the four-month statutory period, which it properly found began on May 7, 2021, and concluded on September 7, 2021 ("Determinative Period"). *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing). The court specifically found that Father had made only one payment of $25.00 toward the Children's support during the Determinative Period and that this payment constituted mere "token" support. The court also found that Father had not provided any kind of support in the form of clothing or food for the Children.

We first note that although the trial court found that Father made only one payment of $25.00 toward the support of the Children, DCS states in its appellate brief that Father paid $25.00 per child, amounting to a total payment of $75.00. DCS cites to child support records that were presented as evidence as a collective exhibit. We will accept DCS's position that Father paid $75.00 in support of the Children during the Determinative Period, rather than one $25.00 payment.[3]

On appeal, Father posits that he was unable to provide financial support to the Children due to his "limited resources," which he had been allocating for the items needed to complete the requirements of his permanency plans such as home repairs and new furniture. DCS contends that Father has waived this issue by failing to file an answer to the termination petition and failing to raise the affirmative defense of lack of willfulness during trial. Father argues "that he does not believe [DCS] presented sufficient evidence

---

[3] On February 27, 2020, the trial court ordered Father to pay $25.00 per child per month in child support.

that he was actually capable of earning an amount sufficient to cover all the expenses required of him by his permanency plan."

We agree with DCS that Father has attempted to raise the affirmative defense of lack of willfulness for the first time on appeal and to erroneously assign to DCS the burden of proving his willfulness. The statutory provision explaining the affirmative defense of lack of willfulness provides:

> (I)     For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

T.C.A. § 36-1-102(1)(I) (Supp. 2022). Thus, Father bore the burden of raising and proving the affirmative defense of lack of willfulness in his pleadings and during trial. Father failed to file an answer to the termination petition or raise the affirmative defense during trial and therefore has waived any attempt on appeal to argue the affirmative defense. *See In re L.F.*, No. M2020-01663-COA-R3-PT, 2021 WL 3782130, at *7 (Tenn. Ct. App. Aug. 26, 2021) (reaffirming that a party waives an affirmative defense if he or she does not include the defense in an answer or responsive pleading and does not raise the defense at trial) (internal citations omitted).

Despite Father's waiver of the defense, DCS maintained the burden to prove that Father's payment of $75.00 during the Determinative Period constituted a token amount. *See In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *10 (Tenn. Ct. App. Nov. 10, 2021) (noting that the burden remained on the petitioners to prove that the father's payments constituted token support). As this Court has previously noted, "token support" and "willfulness" are related but distinct concepts. *See In re Josiah T.*, No. E2019-00043-COA-R3-PT, 2019 WL 4862197, at *7 n.6 (Tenn. Ct. App. Oct. 2, 2019). Although petitioning parties such as DCS no longer bear the burden of proving that the respondent parent "willfully" failed to provide support, the petitioner must still present evidence of the parent's means when alleging that the support provided was merely "token."

According to the statute, "'token support' means that the support, under the circumstances of the individual case, is insignificant <u>given the parent's means</u>." Tenn. Code Ann. § 36-1-102 (1)(B) (Supp. 2022) (emphasis added). A parent's means includes "both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013)). Furthermore, "[d]etermining a parent's available

income and expenses is crucial for determining whether support is 'token.'" *In re Madison J.*, No. M2019-01188-COA-R3-PT, 2020 WL 4279791, at *7 (Tenn. Ct. App. July 24, 2020).

During trial, DCS presented some evidence of Father's income. Specifically, DCS presented a pay stub, dated July 23, 2021, reflecting payment of $326.16 to Father for one week of work at Royal Appliance Manufacturing Company. Arielle White, the DCS foster care worker assigned to this family's case, testified that Father had been employed with Amazon at one point during the pendency of DCS's involvement with the family. However, Ms. White did not indicate whether Father was employed with Amazon during the Determinative Period or what amount he earned while at Amazon. Ms. White also testified that Father was "between jobs" during the summer of 2021, which included a portion of the Determinative Period. Ms. White further indicated that Father may have been working for a lawn care company at some point, but she provided no specifics. In addition, Ms. White testified that Father had received two stimulus checks from the federal government and that he had purchased a $2,000.00 Camaro in approximately March 2021.

DCS presented no evidence related to Father's expenses during the Determinative Period. This Court has previously explained the importance of a parent's expenses in determining a parent's means, stating:

> Previously our Supreme Court has found that a petitioner who did not provide sufficient evidence of respondent's income *and expenses* failed to prove by clear and convincing evidence that the respondent paid only token support when he paid thirty-four percent of the total amount owed. *In re Adoption of Angela E.*, 402 S.W. at 641. "[I]n *Angela E.*, the issue was . . . whether biological father could have paid more, given his means. Biological father's expenses were, therefore, highly relevant to that determination." *In re Jamie G.*, No. M2014-01310-COA-R3-PT, 2015 WL 3456437, at *15 (Tenn. Ct. App. M.S., May 29, 2015). In determining a parent's overall expenses, this court has previously considered the parent's expenses for rent, insurance, utility bills, groceries, household items, the costs of supervised visitation if applicable, and the cost of transportation to get to and from visits. *In re Alysia S.*, 460 S.W.3d 536 (Tenn. Ct. App. 2014).

*In re L.J.*, No. E2014-02042-COA-R3-PT, 2015 WL 5121111, at *6 (Tenn. Ct. App. Aug. 31, 2015) (reversing the trial court's finding of abandonment by failure to support due to insufficient evidence of the mother's expenses and this Court's consequent inability to determine whether the mother's two payments of $64.61 during the four-month statutory period, less than 25% of the child support owed, were insignificant given her means). DCS did not present evidence of any of the above-listed examples of expenses. Yet, the permanency plans indicate that Mother and Father maintained "outstanding debts which cause[d] financial concerns" at the time of the Children's removal, and the evidence

- 9 -

presented throughout trial reflected Father's continuing struggle to pay rent and avoid eviction.

Although much of the testimony revolved around Father's housing issues, DCS elicited no testimony regarding the cost of Father's rent during the Determinative Period. While we acknowledge that a $75.00 child support payment is meager compared to the purchase of a $2,000.00 Camaro, Father's purchase of this vehicle was outside the Determinative Period. Three payments of $25.00 "may well have amounted to merely token support, but it is difficult to substantiate such a conclusion without some evidence of the amount of [Father's] income and expenses." *See In re Steven W.*, No. M2018-00154-COA-R3-PT, 2018 WL 6264107, at *13 (Tenn. Ct. App. Nov. 28, 2018). Inasmuch as DCS failed to present evidence of Father's living expenses during the Determinative Period, we cannot conclude that Father's $75.00 contribution constituted token support and consequently reverse this statutory ground for termination.

### 2. Abandonment by Failure to Establish a Suitable Home

The trial court also determined that clear and convincing evidence supported the statutory ground of abandonment by failure to establish a suitable home. In its order, the court specifically found that (1) DCS had filed a dependency and neglect petition in the trial court, (2) the court had adjudicated the Children dependent and neglected, and (3) the Children were placed in DCS custody. The court further determined that DCS, as established by previous orders, had made reasonable efforts to prevent the removal of the Children or that the circumstances of their situation prevented reasonable efforts from being made prior to their removal. The court also found that during the four-month period following the Children's removal, DCS had made reasonable efforts to assist Father in establishing a suitable home but that Father had not made reciprocal reasonable efforts. The court concluded that Father had demonstrated a lack of concern for the Children such that it appeared unlikely that he would be able to provide a suitable home for the Children at an early date. Upon careful review, we conclude that the evidence presented during trial supports the trial court's findings.

Concerning the first element outlined in subsection (ii)(a), the Children were removed from Father's custody after DCS filed a dependency and neglect petition on January 29, 2020. The trial court subsequently entered an adjudicatory and dispositional order, in which it found the Children to be dependent and neglected by reason of "inappropriate lack of housing." The court found that the family home was in disarray, that a strong odor was present in the house due to the numerous animals, and that a litter box was overflowing with feces in the Children's bedroom. The family also struggled financially and was on the verge of eviction. Furthermore, Stephen and Aiden exhibited severe behavioral issues, and Aiden had been diagnosed with "Severe ADHD" (attention deficit hyperactivity disorder).

With respect to the second element outlined in subsection (ii)(b), the trial court found in its January 29, 2020 protective custody order that DCS had made reasonable efforts to prevent the removal of the Children, and the court incorporated by reference an affidavit of reasonable efforts made by Ms. Medeiros. In her affidavit, Ms. Medeiros related that DCS previously had worked with the family from August 2018 until June 2019 and that during this period DCS had located mental health providers for the family and provided items to assist the family in meeting their basic needs. She also stated that DCS provided in-home social services to the family such as "Youth Villages" and "System of Care Across Tennessee." Ms. Medeiros explained in her trial testimony that "Youth Villages" was an in-home program designed to address the Children's behavioral issues and help Father "cope" with these issues and that System of Care Across Tennessee was a similar, longer-term service, intended to assist the Children at school and the parents at home.

In June 2019, DCS closed its case with the family after setting these social services in place to assist Father and Mother. Ms. Medeiros further testified that Mother attempted to end these services shortly thereafter and that Father and Mother did not give the Children their medication for ADHD as prescribed. Subsequently, in January 2020, the Children informed Ms. Medeiros that their home was "messy" and infested with "lots and lots of bugs." Aiden reported that Mother and Father engaged in both verbal and physical altercations. Moreover, Stephen and William reported to her that "there was not much food in the home." Consequently, DCS re-initiated its involvement with the family. According to Ms. Medeiros, it had become clear that the family could not sustain itself without DCS's assistance. Therefore, based on the above-referenced exhibits and Ms. Medeiros's trial testimony, we agree with the trial court in its finding that DCS made reasonable efforts to prevent the Children's removal from Father's custody. We therefore conclude that the trial court properly determined that DCS proved by clear and convincing evidence the elements contained within subsections (a) and (b) of the statute.

Father, however, contests the trial court's findings related to subsection (c), contending that DCS did not make reasonable efforts to assist him in establishing a suitable home during the four months following the Children's removal. The evidence presented during trial belies Father's assertion. Concerning "reasonable efforts," this Court has previously explained:

> Reasonable efforts is a fact intensive inquiry and must be examined on a case-by-case basis. *State v. Puryear*, [No. W2004-02878-COA-R3-PT,] 2005 WL 735038, *9 (Tenn. Ct. App. Mar. 30, 2005). "Reasonable efforts" as defined by the legislature is "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tennessee Code Annotated section 37-1-166(g)(1) (2003). However, the burden of family reunification does not lie entirely with DCS as reunification is a "two-way street." *State Dept. of Children's*

*Services v. Belder*, [No. W2003-02888-COA-R3-PT,] 2004 WL 1553561, *9 (Tenn. Ct. App. July 9, 2004).

*In re C.L.M.*, No. M2005-00696-COA-R3-PT, 2005 WL 2051285, at *9 (Tenn. Ct. App. Aug. 25, 2005)

With respect to the "four (4) months following the physical removal," the trial court considered the four months immediately after removal, January 30, 2020 to May 30, 2020.[4] During the four-month period after the Children's removal from Father's custody, DCS developed the first of four permanency plans on February 4, 2020, delineating the requirements for Father to regain custody of the Children. These requirements included completing a "Psychological/Parenting assessment" and following the resultant recommendations. Ms. White testified that she had referred Father to a mental health provider for a mental health and parenting assessment after he and Mother were evicted and had moved in with Father's mother in Lafayette. When Mother and Father relocated to a rental house in Watertown in March 2020, Ms. White discussed with them mental health services that could be provided closer to their new home in Watertown. Father, however, insisted on finding a mental health provider through his own health insurance.

According to her affidavit of reasonable efforts, entered into evidence as an exhibit, Ms. White conducted a Child and Family Team Meeting with Father and Mother on February 4, 2020, and transported Father and Mother to a supervised visit with the Children on February 5, 2020. DCS set up a weekly video conference call between Father and Mother and the Children. Ms. White facilitated at least one other Child and Family Team Meeting during this period, and she joined a video conference meeting with the Children's school staff and Father to discuss the Children's "Individualized Education Program." Ms. White also visited the Watertown home on March 10, 2020, for a safety assessment and determined that it was spacious and clean but completely lacked furniture. During the visit, Ms. White specified what Father needed to accomplish in terms of his mental health treatment.

---

[4] We note:

> "[T]he proof necessary to support termination under this ground need not be limited to any particular four-month period after removal. As long as the proof relates to 'a period of four (4) months following the removal, . . . the ground may be established.'" *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)). Thus, our inquiry is not limited "to a period of four months immediately following the [child's] removal." *Id.*

*In re Joseph D.*, No. M2021-01537-COA-R3-PT, 2022 WL 16848167, at *13 (Tenn. Ct. App. Nov. 10, 2022). Nevertheless, we will consider the four months immediately following the Children's removal inasmuch as this is the period that the trial court considered.

With respect to Father's "reciprocal reasonable efforts," we recognize that Father secured a large, clean house by the end of the four-month period. However, we cannot determine that Father's lease of a clean house was equal to or exceeded the efforts made by DCS. *See* T.C.A. § 36-1-102(1)(A)(ii)(c) ("The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal . . . ."). By the end of the four-month period on May 30, 2020, Ms. White concluded that Father had not established a suitable home for the Children. The home lacked beds and bedding for the Children and "mental health and parenting concerns" remained unresolved.

Ms. White testified that DCS's concerns with the family had included bugs in the home, untreated mental health issues for the parents and the Children, and domestic violence between the parents. Nevertheless, according to Ms. White, Father did not complete a mental health assessment or parenting assessment until June 2020. As a result of the mental health assessment, Father was diagnosed with "adjustment disorder with depressed mood." Father was recommended to undergo "intensive outpatient services" three times per week. In addition, Ms. White reported at trial that Father had stated that he had issues with anger and had in the past experienced "suicidal ideations." Despite these concerns, thirteen offered intensive outpatient appointments, and twenty-six attempts by the health care provider to re-schedule, Father did not begin to seriously address his mental health issues with therapy until November 2021, months after the termination petition had been filed. Furthermore, Ms. White testified that Father had shown no sense of urgency in making adjustments and that he did not contact DCS to report changes in his residence or the addition of roommates.

On appeal, Father posits that "the only issue at the time of removal which needed remedying was the lack of an appropriate house," dismissing any need on his part to address DCS's concerns regarding his mental health and parenting. This Court previously has elucidated the meaning of "suitable home," stating:

> We do not agree with Mother that matters related to counseling and assessments have no bearing on the suitability of the home, as that concept is contemplated in Tenn. Code Ann. § 36-1-102(1)(A)(ii). While there is, of course, a physical element to the concept of a "suitable home," the problems and conditions for which the various assessment and counseling efforts were conducted address matters which make the home environment suitable for raising children and which keep them from becoming dependent and neglected. A well-built, fully furnished home does not a "suitable home" make; neither is a home which may lack some comforts or conveniences unsuitable for that reason alone. The failure of Mother and Father to cooperate with DCS and to comply with the requirements of the various

- 13 -

<u>counseling services was directly related to the establishment and maintenance of a suitable home.</u>

*In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at \*5 (Tenn. Ct. App. May 21, 2009) (emphasis added). This Court has explicitly held that a parent's "failure to address mental health issues can also lead to a finding that the parent has failed to establish a suitable home." *In re Ashanti P.*, No. M2021-00039-COA-R3-PT, 2021 WL 5549590, at \*11 (Tenn. Ct. App. Nov. 29, 2021). Therefore, Father was not only required to provide a suitable dwelling but also a "safe and stable environment" in which the Children could live with "the presence of a care giver who can supply the care and attention" the Children need. *See In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at \*5 (Tenn. Ct. App. May 31, 2017) (quoting *In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at \*9 (Tenn. Ct. App. Mar. 23, 2015)).

Furthermore, although the trial court declared the Children dependent and neglected due to "inappropriate lack of housing," its findings in both the protective custody order and the order adjudicating the Children dependent and neglected reflected problems in the home that extended beyond the physical space itself. In its protective custody order, the court incorporated by reference Ms. Medeiros's affidavit, which reflected persistent parenting and behavioral issues to the extent that DCS had to involve two different in-home assistance programs to help Father "cope" with the Children's severe behavioral issues. Ms. Medeiros also listed in her affidavit specific services and accomplishments necessary for the Children's return to Father's custody. These goals included Father's completing a psychological and clinical parenting assessment and following all of the recommendations from the psychological and clinical service providers.

In addition, in its order adjudicating the Children dependent and neglected, the trial court made unsupervised visitation with Father contingent on DCS's and the guardian *ad litem*'s receipt of Father's mental health and counseling records. In sum, Father's mental health and manner of coping with the Children's behavioral issues was an aspect that rendered the home environment unsuitable at the outset. Notwithstanding Father's failure to timely address his mental health issues, Father also did not provide an appropriate physical space for the Children inasmuch as the Watertown rental home lacked beds and bedding for the Children.

The evidence also supports the trial court's finding that Father had demonstrated a lack of concern for the Children to such a degree that it appeared unlikely that he would be able to provide a suitable home for the Children at an early date. When considering this element of the statutory abandonment ground, we may consider Father's more recent actions. *See In re Billy T.W.*, No. E2016-02298-COA-R3-PT, 2017 WL 4317656, at \*9 (Tenn. Ct. App. Sept. 27, 2017). By the time of trial, Father still had not established a suitable home for the Children and was living with his new girlfriend in a rental house in Sparta. Ms. White conducted a walk-through inspection of the home and discovered water

leaks, lighting issues, exposed wires, and a strong pet odor similar to that present in the family home at the time of the Children's removal. Additionally, in December 2020, Father was housing ten animals again. The number of pets and the manner in which they were maintained in the original family home were contributing factors to the Children's removal from Father's custody. Ms. White returned to the Sparta house for an unannounced visit in March 2022 but was prohibited by Father from entering the house because puppies had recently "destroyed the home."[5] According to Ms. White, Father claimed that he and his girlfriend were "puppy-sitting." Ms. White also witnessed several animals in the windows and on the porch.

Mr. White further stated that Father never produced requested documentation indicating that his name was on the lease or registered with the utility company for the Sparta house. In addition, DCS requested biographical information of Father's girlfriend in August 2021 in order to conduct a necessary background check but still had not received the requisite information at the time of trial. Furthermore, as previously noted, Father had just begun consistent counseling for his mental health issues in November 2021. On March 8, 2022, Father informed Ms. White that he was in a "deep, dark place" and had recently suffered a mental breakdown.

Father's lack of urgency with respect to securing a suitable physical environment and addressing his mental health issues reflects a lack of concern for regaining custody of the Children. Thus, it was unlikely at the time of trial that Father could provide the Children with a suitable home at an early date. We agree with the trial court that clear and convincing evidence established that Father had failed to provide the Children with a suitable home despite reasonable efforts by DCS to assist him. We affirm the trial court's finding of this statutory ground for termination of Father's parental rights.

### B. Substantial Noncompliance with Permanency Plans

The trial court likewise found clear and convincing evidence supporting the ground of substantial noncompliance with the reasonable requirements of the permanency plans developed by DCS. Tennessee Code Annotated § 36-1-113(g)(2) (Supp. 2022) provides as a ground for termination of parental rights:

> There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]

---

[5] Based upon our review of the record, we are unable to discern the extent of the destruction inside the home. Ms. White testified that Father had told her that she was not allowed inside the home due to "puppies . . . that had destroyed the home." Given that Father refused Ms. White's entry and that she was consequently unable to discern the degree and extent of the harm caused by the animals, we only have Father's statement to Ms. White that puppies had "destroyed the home" upon which to rely.

- 15 -

"A trial court must find that the requirements of a permanency plan are 'reasonable and related to remedying the conditions which necessitate foster care placement.'" *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002) (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *Id.*

To terminate parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(2), the parent's noncompliance with the permanency plan must be substantial. *Id.* at 548. Our Supreme Court has held that "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* Additionally, "[o]ur focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016). This Court has explained the following regarding the ground of substantial noncompliance with the permanency plan:

> Mere noncompliance is not enough to terminate a parent's rights. *In re Valentine*, 79 S.W.3d [539,] 548 [(Tenn. 2002)]. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d [643,] 656 [(Tenn. Ct. App. 2004)] (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *In re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)). Yet, we must determine compliance in light of the permanency plan's important goals:

> > In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where return to parent is the goal, parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.

> *In re V.L.J.,* No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).

*In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *20-21 (Tenn. Ct. App. Oct. 21, 2015).

In its judgment terminating Father's parental rights, the trial court determined that the requirements of the permanency plans were reasonably related to remedying the conditions necessitating foster care. The court found that Father had only recently begun to address his mental health issues, never provided DCS with a budget, and failed to provide a suitable home for the Children, as required by the permanency plans. The court further determined that Father had not actively participated in the Children's education, extracurricular activities, or mental health treatment. Based upon our review of the evidence, the proof supports the trial court's findings and conclusions concerning this statutory ground for termination.

In the initial permanency plan, as ratified by the trial court, DCS listed "environmental neglect, financial instability, and mental health concerns" as the reasons for its involvement with the family. DCS set forth the following responsibilities for Father: (1) complete a psychological/parenting assessment, follow the resultant recommendations, keep all scheduled appointments, and sign a release for all providers to allow DCS to obtain documentation of progress; (2) continue to work with community partners to address the Children's mental health needs and the family's needs; (3) create and share a budget with DCS and display an ability to provide for the financial needs of the family; (4) treat home and items for bugs; (5) move to a new home that is safe and meets the family's basic needs, allow DCS to complete a home inspection, and verify through rental agreement and utility bills the ability to meet needs of the family; (6) decide, in conjunction with treatment providers and DCS, a manageable number of pets to keep and reduce the number of pets to reflect that number; (7) create a routine of cleaning after remaining pets; (8) enjoy four hours of monthly supervised visitation with the Children and weekly phone calls; and (9) be involved in the Children's mental health care. Father agreed to the terms of the plan, and the trial court ratified the plan, determining that its requirements were reasonable and related to the conditions that necessitated foster care.

DCS created three additional permanency plans throughout the pendency of the case. Father's responsibilities remained largely the same from plan to plan with the exception of two responsibilities added to later plans. These added responsibilities were (1) stay in regular communication with school providers regarding the Children's behaviors and (2) provide the names and dates of birth for any roommates residing with Father.

On appeal, Father again posits that this Court should only consider as relevant the requirements related to remedying the lack of appropriate physical housing for the Children inasmuch as this was the only stated reason for the Children's removal in the trial court's dependency and neglect order. We, however, decline to dictate such a narrow rule by holding that every permanency plan responsibility must be related to the initial reason for removal outlined in a dependency and neglect order. We emphasize that permanency plan requirements must relate to "conditions necessitating foster care placement," which may include "conditions related both to the child's removal and to family reunification." *See In re Valentine,* 79 S.W.3d at 547 (emphasis added). Issues preventing family reunification

are not strictly confined to those conditions that initially precipitate removal but may include issues that arise throughout the pendency of DCS's custody of a child.

For instance, in *In re Lesley A.*, the mother advanced a similar argument, contending that the requirements in her permanency plans were not reasonably related to the conditions that caused the child to enter state custody, namely, educational neglect and inadequate supervision. *See In re Lesley A.,* No. E2018-00594-COA-R3-PT, 2018 WL 6655680, at *13 (Tenn. Ct. App. Dec. 18, 2018). This Court concluded that the mother's argument reflected a "misunderstanding of the applicable legal principles" and emphasized that DCS and the trial court had identified the mother's "residential instability, mental health issues, and substance use problems" as conditions that required the child to remain in foster care and impeded family reunification. *Id.* These conditions in *In re Lesley A.* went beyond the reasons for the child's initial removal into DCS custody. *Id.*

Additionally, in *In re Amber R.*, this Court considered conditions that led to the children's removal such as environmental neglect, as well as conditions discovered after the Children entered into DCS custody, such as mental health and financial issues, which had further prevented family reunification. *In re Amber R.*, No. W2019-01521-COA-R3-PT, 2020 WL 7861247, at *7 (Tenn. Ct. App. Dec. 29, 2020). In *In re Quintin S.*, the mother argued that her permanency plan's requirement that she resolve all legal issues was unrelated to the reasons for the children's removal, namely, environmental neglect and drug exposure. *In re Quintin S.*, No. E2016-02150-COA-R3-PT, 2017 WL 2984193, at *13, 17 (Tenn. Ct. App. July 13, 2017). This Court rejected the mother's contention, finding that the "requirement that [the m]other resolve her legal issues [was] reasonably related to returning her children to her care." *Id.* at *13. Thus, we reaffirm that the requirements and responsibilities in a permanency plan need not be related exclusively to the initial reason or reasons for a child's removal but may also be related to reasons that surface following a child's removal and subsequently impede family reunification.

In the present case, the trial court found that the Children were dependent and neglected due to "inappropriate lack of housing." In its findings of fact supporting its adjudication of the Children as dependent and neglected, the court included facts regarding the unfit state of the family home, the number of animals the family owned, the family's "outstanding bills" preventing them from obtaining public housing, Mother's report that the family was in a "financial rut," the Children's "major behavioral issues," Aiden's and Stephen's ADHD diagnoses, and Mother's past history of suicidal ideations.

Although the trial court did not include findings of fact regarding Father's mental health, it conditioned future unsupervised visitation upon DCS's and the guardian *ad litem*'s receipt of Father's "mental health counseling records." In addition, Ms. White testified during trial that Father had informed her that he experienced "issues with anger" and that he had also entertained suicidal ideations. Father's anger had a direct impact on the Children when they were in his custody. Ms. Medeiros testified that the Children feared

him because he was "so quick to anger" and that "their emotions were kind of tied to their parents' emotions." Ms. Medeiros also related instances in which Father excessively disciplined the Children.

Jason Lewis, the Children's therapist, testified that after working with the Children for some time, he introduced Father into their counseling sessions to "assess and facilitate familial therapeutic sessions." Mr. Lewis discontinued Father's involvement with these sessions after only a few months inasmuch as Father had not been pursuing his own mental health treatment and the Children exhibited elevated anxiety and "emerging negative behaviors" as a result of their time spent with Father. David Wright, the Children's special education teacher, testified that it would be "very difficult" for a parent who is not emotionally stable to handle the Children and their behavioral issues. As referenced previously, Father suffered a "mental health breakdown" as recently as a month prior to trial. We therefore reject Father's postulate that only the requirements related to physical housing were relevant to the conditions necessitating the Children's continued stay in foster care. We conclude that the responsibilities of the permanency plans were reasonable and related to resolving conditions that necessitated foster care.

Based on the evidence presented, we conclude that Father's conduct resulted in substantial noncompliance with the goals and responsibilities of the permanency plans. With respect to Father's responsibilities concerning his mental health, Father completed a mental health assessment in June 2020 but then failed to follow the recommendations from the assessment. Ms. White testified that Health Connect America, the provider who facilitated Father's mental health assessment, had scheduled thirteen appointments in July and August of 2020, none of which Father had attended. Health Connect America then attempted unsuccessfully to contact Father twenty-six times to schedule appointments from August 2020 through May 2021.

Ms. White further reported that when Father had briefly engaged a therapist near the end of 2020, he had not given the provider his mental health assessment, assessment recommendations, or mental health history. Ms. White further stated that Father had not continued treatment beyond a few sessions. Only after DCS filed the termination petition did Father complete an intake appointment and begin regular therapy at a facility known as "Life Care." According to Ms. White, Father acknowledged to her that he had been "stubborn" with respect to addressing his mental health. Although Father began to take steps toward following the recommendations of his mental health assessment, as required by the permanency plans, these efforts were "too little, too late." *See In re Daymien T.*, 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016) (concluding that the father's "progress on the requirements of the permanency plan after the filing of the termination petition" were "too little, too late" considering the father had failed to take any action for nearly two years after the child had been removed from his custody) (internal citations omitted).

- 19 -

Father has also failed to provide or initiate any real steps toward providing a new home that is safe and meets the family's basic needs. After his and Mother's eviction from the family home in early 2020, Father moved in with his mother, whose past history with DCS rendered her home an unfit location for the Children. Then Father moved to the Watertown rental house, which completely lacked furniture. Eventually, Father allowed roommates to move into the Watertown rental house, and DCS was never provided the necessary information for the completion of the requisite background checks. By March 2021, Father had been evicted from the Watertown house and relocated to his girlfriend's house in Sparta, where he was residing at the time of trial.

Father never provided to DCS any evidence that his name was listed on the Sparta lease agreement or registered with the utility company despite having been made aware by Ms. White that these actions were prerequisites for the Children to live with him. As stated previously, the house in Sparta presented its own problems. Of particular concern, Father began housing many animals again, some of which "destroyed the home" to such an extent that he barred Ms. White's entry for an inspection in March 2022. In addition, Ms. White never observed beds or bedding for the Children in any of Father's residences. According to Ms. White, Father was behind on his rent at his current location as recently as February 2022 and had been evicted from two of his previous houses. With respect to the financial responsibilities outlined in the permanency plans, Father never produced a budget to DCS.

Concerning responsibilities that involved Father's engagement with the Children, Ms. White testified that Father stopped visiting the Children as frequently when they began to participate in sports despite Father's having been invited to attend and offered visitation following games. Father did not participate consistently in phone and video calls. Father visited the Children once in November 2021 but not again until the end of February 2022. Father insisted that he could schedule visits with the foster parents on his own without the assistance of DCS but failed to do so. Father's failure to timely address his mental health issues also rendered family counseling sessions untenable. DCS further presented evidence that Father did not stay in communication with the Children's educational providers.

The two most significant areas of concern proved to be Father's mental health and the suitability of Father's home environment. Clearly, Father did not make concerted efforts to address these areas of concern. Father failed to comply with many if not all of the reasonable responsibilities of the permanency plans. We therefore determine that clear and convincing evidence supported this statutory ground for termination as well.

C. Persistence of Conditions Leading to the Children's Removal

The trial court also found clear and convincing evidence of the statutory ground of persistence of the conditions leading to removal of the Children from Father's custody. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (Supp. 2022) provides:

(A)     The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

    (i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

    (ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

    (iii)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B)     The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In finding that the conditions that had led to the removal of the Children persisted, the trial court made the following findings of fact:

The State is required to prove the child has been removed from the home or the custody of a parent for a period of six months by a court order based on dependency and neglect. The Court finds that this has been clearly established.

* * *

The Court finds that the conditions that led to the removal were the terrible conditions of the home and the parent's failure to meet the mental health needs of the children.

The Court finds that these children are special needs children and that they have many mental health needs that really takes somebody that is trained and willing to spend all the time and effort that they need to meet those needs.

The Court finds that the children's needs were not being met when the children were removed from the home and the conditions of the home itself was a factor.

At that time, the parents were in the process of being evicted from their family home.

The Court finds that conditions still exist that prevent safe return to the care of [Father].

Specifically, the Court finds that there is still no suitable home for the children and that the father's mental health needs have not yet been met.

The father is in no condition to take care of the children.

He has not been able to show that he is financially able to support the children.

Therefore, those conditions still persist, and he has had two years to remedy those conditions.

Based upon the above findings, the Court finds that there is little likelihood that those conditions will be remedied at an early date so that the children would be returned in the near future.

The Court finds that the continuation of the parent-child relationship greatly diminishes the children's chances of an early integration into a safe, stable, and permanent home.

The Court finds that all those factors under this ground have been established by clear and convincing evidence.

(Paragraph numbering omitted.) The evidence presented during trial preponderates in favor of these findings. The Children were removed from Father's custody on January 29, 2020, following the filing of a dependency and neglect petition. The Children remained in DCS custody continuously through the time of trial, which occurred over two years after their removal.

The Children were removed by reason of inappropriate housing. This condition persisted at the time of trial. As we have previously addressed, Father never resided in a home that was appropriate for the Children's return during the two years following their removal from his custody. In that two-year timeframe, Father's living situations included: the home of his mother, who had her own history with DCS that rendered her home an

untenable option; (2) the Watertown house, which lacked beds and bedding, sometimes included roommates who could not be screened by DCS due to a lack of biographical information, and at one point housed ten animals; and (3) the Sparta house with his girlfriend.  As to the Sparta residence, Father never provided proof to DCS that his name was on the lease agreement or registered with the utility company.  In addition, DCS was unable to perform a background check respecting his girlfriend insofar as it never received the requisite biographical information.  When Ms. White attempted to conduct another inspection in March 2022, Father prevented her entry because puppies had "destroyed the home."  Lastly, in the two-year period since the Children's removal, Father had been evicted from two rental houses and was behind on his rent payment at his current location as recently as February 2022.  In sum, Father's housing issues persisted.

In addition, Father commenced following the recommendations of his mental health assessment after the termination petition had been filed.  Ms. White testified that Father suffered a "mental health breakdown" as recently as March 2022.  Thus, Father's mental health concerns continued up to the time of the trial.

We also agree with the trial court that continuation of the parent-child relationship would diminish the Children's chances of integration into a safe, stable, and permanent home.  Based on the evidence presented during trial, Father's presence in the Children's lives clearly produced a deleterious effect on their behavior.  Ms. White testified that the school system, foster parents, and the Children's therapist observed that the Children regressed into negative behaviors and emotions "surrounding or following visitation" with Father.  Ms. White, Mr. Wright, and Mr. Lewis each respectively articulated that the Children required stability and consistency from a caregiver in order to continue to make progress behaviorally and address their mental health issues.

At the time of trial, Father could not provide the Children with the stability they needed to thrive mentally and educationally.  Upon our thorough review, we conclude that the evidence does not preponderate against the trial court's findings, and we agree that clear and convincing evidence established that the conditions leading to the Children's removal persisted.

### D.  Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Children

Lastly, the trial court found clear and convincing evidence that Father had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children.  Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (Supp. 2022) provides:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial

responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, DCS was required to show by clear and convincing evidence that (1) Father failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Children and (2) returning the Children to Father's custody would pose a risk of substantial harm to the Children's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

The trial court made the following findings of fact pertinent to this statutory ground: (1) Father failed to obtain necessary mental health treatment; (2) Father failed to provide a home for the Children; (3) Father failed to exhibit the financial ability to care for the Children; (4) Father had not shown that he could meet the Children's "specific special needs"; and (5) Father was incapable of addressing the Children's "very special needs." The court determined that returning the Children to Father's custody would pose a risk of substantial harm to the physical or psychological welfare of the Children. The court further found that the Children's "behavior was terrible" when they were removed from Father's custody in January 2020 and that the Children would regress if returned to Father. The evidence presented during trial preponderates in favor of the court's findings.

Father contends that he exhibited an ability and willingness to assume custody of the Children during their time in foster care, pointing to his "active" participation in the case, improved housing situation, and attempts to complete the other requirements of the permanency plans. Predicated on our review of the evidence, we conclude that Father's argument is unavailing. As previously addressed, Father was unable to obtain suitable housing during the two-year period that the Children were in foster care. With respect to his residence at the time of trial, Father never provided proof to DCS that his name was included on the lease agreement or registered with the utility company. Ms. White testified that Father would not proactively inform DCS of changes in residence or the addition of roommates.

In addition, Ms. White reported that there were periods of time throughout the pendency of DCS's custody of the Children during which she could not contact Father. Father's failure to communicate with DCS was highlighted by Ms. White's testimony that Father had informed her that he had ended his relationship with his girlfriend but then a month later introduced his girlfriend to the Children without any prior notification to DCS or the foster parents. Based on his inaction with respect to these straightforward tasks, Father failed to demonstrate a willingness to cooperate with DCS or take seriously the prospect of regaining custody of the Children.

Furthermore, Father's habit of inappropriately housing too many animals did not resolve. Ms. White testified that he continued to house ten animals in December 2020 and that puppies had "destroyed the home" as recently as a month prior to trial. Again, by this behavior, Father failed to act with a sense of seriousness or urgency when it came to addressing the residential concerns leading to the Children's removal. We therefore cannot conclude that Father demonstrated a willingness to assume custody of the Children.

We also cannot conclude that Father demonstrated an ability to assume custody of the Children. According to Ms. White, Father never supplied beds or bedding in anticipation of regaining custody of the Children. He had not achieved a suitable home for the Children by the time of trial. In addition, he continued to exhibit serious financial problems, having been evicted from two separate rental homes during the two years since the Children were removed from his custody and having struggled to pay his rent as recently as February 2022. As noted previously, we cannot conclude that Father's payments of $75.00 in child support constituted token support given the scant evidence regarding his financial means. Regardless, Father's payment of only $75.00 spanning the course of two years at best evinces an inability to financially provide for the Children and at worst demonstrates an unwillingness to do so.

In support of this statutory ground, DCS was also required to prove that returning the Children to Father's custody would pose a risk of substantial harm to the Children's welfare. *See In re Neveah M.*, 614 S.W.3d at 674, 677. This Court has previously observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

Mr. Wright testified that he began supervising Stephen and Aiden at their elementary school in February 2020. According to Mr. Wright, Stephen and Aiden had advanced significantly both behaviorally and educationally by the time of trial. When he first began assisting Stephen and Aiden at school, Stephen was prone to lying and stealing, and Aiden was labeled as a "flight risk." In addition, Stephen could not read. Aiden exhibited signs of food insecurity and would frequently steal from the plates of other students during lunch. In Mr. Wright's estimation, the stability provided by their foster

home contributed to Stephen's and Aiden's improvement at school although he affirmed that they were still "educationally fragile." Mr. Wright also testified that he believed that their behavior at school reflected their home environment and affirmed that a change in their home environment would have an extremely negative effect on Stephen and Aiden.

According to Mr. Lewis, whom the trial court found particularly credible, the Children exhibited "emerging negative behaviors" and elevated anxiety following counseling sessions with Father. Their behavior improved when Mr. Lewis discontinued the family sessions. Mr. Lewis testified that prior to trial, Father had promised the Children that he would surrender his parental rights. According to Mr. Lewis, the Children appeared relieved and indicated to him that it had been the "greatest day" of their lives. In contrast, the Children appeared anxious and fearful after they were informed that Father had changed his mind and decided not to surrender his parental rights.

Mr. Lewis affirmed that there would be a risk of harm to the Children's mental health if returned to Father. Mr. Lewis reported that, in his estimation, Father would be unable to provide the parental guidance and care the Children needed and that the Children would "really struggle to regulate in the home environment." Additionally, Mr. Lewis explained that when he said "regulate," he meant able to "receive information, respond and sit still within a normal range of behavior, being able to keep [their] hands to [them]selves and not acting out and things of that nature." According to Mr. Lewis, the Children and Father primarily connected over video games, and Father assumed the role of brother rather than that of a father. Mr. Lewis did not recommend contact between Father and the Children in the near future, and Ms. White testified that Aiden had reported thoughts of hurting himself so that he would not have to return to Father's custody.

Based upon the trial testimony, returning the Children to Father would be detrimental to the progress the Children had made educationally and behaviorally at the time of trial. In addition, the danger posed was not a "theoretical possibility," but rather a likelihood that had previously been demonstrated when Father and the Children had contact. Considering all the evidence at trial, the Children would likely suffer from the same issues that led to their removal if returned to Father's custody. We therefore affirm the trial court's finding that clear and convincing evidence established that Father failed to manifest an ability and willingness to assume the legal and physical custody of or financial responsibility for the Children and that returning the Children to his custody would pose a risk of substantial harm to their welfare.

V. Best Interest of the Children

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is

separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (Supp. 2022) lists the following factors for consideration:

(A)   The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)   The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)   Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)   Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)   Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)   Whether the child is fearful of living in the parent's home;

(G)   Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)   Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides:  "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."  Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination."  In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis.  In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).  Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence."  In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861).  "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]."  Id.  When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective."  In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors.  Id.  "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ."  Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors.  In re Audrey S., 182 S.W.3d at 878.

And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final judgment, the trial court weighed nearly all of the twenty best interest factors in favor of termination of Father's parental rights. Upon our thorough review of the evidence presented in this matter, we determine that the trial court's findings regarding the best interest factors are supported by a preponderance of the evidence with the exception of the court's findings related to factor (S). With respect to factor (S), the court found that Father had not provided more than token support. Considering the scant evidence related to Father's means, the evidence preponderates against the court's finding, and this factor should weigh neither in favor of nor against termination.

Concerning factor (A), the court found that termination of Father's parental rights would have a "very positive effect" on the Children, noting that the Children were in a loving home. The court expressed that it was "very impressed with the foster home" and noted that the Children had made great progress under the care of the foster parents. The evidence preponderates in favor of these findings.

The Children's foster father, Rick S. ("Foster Father"), testified regarding the structured lifestyle that he and his wife had provided to the Children. Although the Children were not accustomed to rules when they first arrived in the care of the foster parents, Foster Father reported that by the time of trial the Children bore responsibility for assigned chores on the foster family's farm. Foster Father explained that the structure provided in their household enabled the Children to thrive. During their stay in the foster home, the Children had improved educationally and behaviorally. For instance, Foster

Father testified that Aiden had achieved "Student of the Month" recently. Additionally, Mr. Wright accredited the Children's educational success to their new home environment. In contrast, Father's living situation was rife with unpredictability given his recent mental breakdown and inability to establish a suitable home. By reason of Father's unpredictable living situation and conversely the stability provided by the foster home, we cannot conclude that the evidence preponderates against the trial court's findings with respect to the first factor.

Additionally, the trial court weighed factor (B) in favor of termination, citing Mr. Lewis's and Mr. Wright's testimonies in support of its finding. Both Mr. Lewis and Mr. Wright testified that the Children would likely regress and begin to exhibit negative behaviors and emotions if returned to an unstable environment. As reviewed above, Father could not provide the Children with a stable environment at the time of trial. Furthermore, Mr. Lewis articulated that if returned to Father's custody, the Children would likely be unable to regulate their emotions and behaviors under his care. The evidence therefore preponderates in favor of the trial court's findings related to this factor.

The findings related to factor (B) also relate to factor (T), whether the mental or emotional fitness of the parent would be a detriment to the Children. As previously addressed, Father suffered a mental breakdown as recently as a month prior to trial. Father's contact with the Children continually resulted in their worsened behavior. Ms. Medeiros testified that the Children's emotions were tied to Father's emotions. The evidence presented during trial establishes a general environment in which Father's mental and emotional issues fed the Children's emotional, mental, and behavioral concerns. Considering that Father only began to address these concerns in November 2021, we cannot conclude that the evidence preponderates against the court's finding that Father's mental health issues prevented Father from creating a safe and stable environment to which the Children could return.

Regarding factor (C), which is related to factor (A), the trial court found that Father had not demonstrated any continuity and stability in meeting the Children's needs. The evidence preponderates in favor of this finding. Over the course of two years, Father resided in four different residences and failed to establish a suitable home for the Children.

With respect to factors (D) and (H), the trial court determined that the Children did not have a secure and healthy parental attachment to Father but that they did maintain a healthy parental attachment to the foster parents. Mr. Lewis testified that Father's relationship with his Children resembled that of a brother rather than a father. Much of their relationship seemed to be centered on video games. Mr. Lewis stated that the Children did not mention Father often, and Foster Father testified that the Children did not mention Father at all. Ms. Medeiros reported that the Children were afraid of Father due to his short temper. In contrast, Mr. Lewis stated that the Children had referred to the foster parents as

their "mom and dad." Therefore, the evidence preponderates in favor of these findings as well.

Concerning factor (E), the trial court found that Father had maintained visitation and contact with the Children. Nevertheless, the court also found that Father had failed to take advantage of some opportunities for visitation. Considering the evidence presented, we agree that Father inconsistently visited the Children, failing to visit them for months at a time after the termination petition was filed. In addition, when Father did visit the Children, the outcome was generally negative. The Children would regress and exhibit negative emotions and demeanor following Father's visits and phone calls. In addition, Father often made false promises concerning his progress in establishing a home for the Children. As the trial court noted, Father announced to the Children his intent to surrender his parental rights and then reneged on this decision, dispelling the Children's hopes for adoption by the foster family. In addition, Mr. Lewis testified:

> There's been a lot of talk about, you know, preparing the home and getting it clean and getting bedding and new beds and furniture and things like that and the boys have been disappointed with that not being followed through with. And they've talked about it. And now when we mention it they say we don't want to do that anymore; we don't want that.

We therefore discern that this factor weighed in favor of termination as well, particularly considering that Father's visitation and contact with the Children did not serve to "cultivate a positive relationship" between Father and the Children.

Regarding factors (F) and (G), the trial court determined that the Children feared returning to Father's custody and that Father's living situation would further traumatize the Children. Foster Father testified that Stephen was adamantly opposed to returning to his Father's custody and that he feared the prospect of such. Mr. Lewis also testified that the Children were afraid to return to Father's custody. Aiden indicated to Ms. White that he thought about hurting himself every day to prevent returning to Father's custody. With respect to factor (G), returning to a house that had recently been "destroyed" by animals, a situation reminiscent of the Children's family home at the time of their removal, would certainly trigger or exacerbate their trauma related to their initial removal. Ms. White testified that the Children had been diagnosed with post-traumatic stress disorder and that they presented a "high reaction" to Father and the court system. We therefore find that the trial court is correct in its assessment that returning the Children to Father's care and custody would trigger or exacerbate the Children's experience of trauma.

The trial court found that the evidence related to factor (I) was minimal but that it indicated that the Children enjoyed healthy relationships with their foster siblings. Foster Father testified that his two children worked with the Children, "show[ed] them things on the farm," and spent time with them. In addition, although not reflected in the court's

- 32 -

judgment, Ms. White testified that the foster family intended to maintain contact with the Children's biological sister, who was also placed in DCS custody. According to Ms. White, the Children loved their sister. Predicated on the evidence presented, the termination of Father's parental rights would not inhibit the Children from maintaining a relationship with their biological sister. The evidence therefore preponderates in favor of the trial court's findings with respect to this factor.

With respect to factor (J), the trial court found that Father had not made any adjustment of circumstances to render his home safe for the Children. Given that the interior of Father's home was destroyed to the extent that he refused Ms. White's entry for an inspection a month prior to trial, the evidence supports the trial court's finding that Father had not made a lasting adjustment of his circumstances, conduct, or conditions such that his home would be safe or beneficial for the Children. The Children were removed from Father's custody in part due to a disarrayed house manifesting numerous animals and animal feces. In addition, Father had not sufficiently addressed his anger and mental health issues. Ergo, we agree that Father has not made an adjustment of circumstances to render his home safe for the Children given the testimony presented during trial.

Concerning factor (K), the trial court determined that DCS had proposed programs and services to Father "over and over and over" and that after two years Father still had not taken advantage of all the services that had been offered to him. We agree that DCS attempted to assist Father with mental health treatment. We also recognize that Father had begun to seek treatment in November 2021. However, considering that Father only started to take mental health treatment seriously following the filing of the termination petition, we do not conclude that the evidence preponderates against the court's finding that Father did not fully take advantage of the assistance that was offered to him by DCS.

Moreover, the trial court determined that DCS had "gone above and beyond" in making reasonable efforts to assist Father in achieving a lasting adjustment in its consideration of factor (L). The evidence during trial reflected that Ms. White continually put more effort into addressing Father's housing and mental health issues than Father did himself. Father rejected her assistance in seeking mental health treatment and did not embrace the initiative to comply with simple requests by DCS. In contrast, Ms. White continued to inspect Father's homes.

Factor (M) relates to Father's sense of urgency or lack thereof. The trial court found that Father had not demonstrated a sense of urgency in the two years since the Children's removal. Although Ms. White testified that Father regularly attended Child and Family Team Meetings, we note that Father failed to comply with straightforward tasks such as providing DCS with a copy of his lease agreement for the Sparta house or presenting the necessary information for DCS to conduct a background check relative to his roommates and girlfriend. He did not take seriously his mental health issues until after the termination

petition had been filed. The evidence therefore preponderates in favor of the court's findings at to this factor.

Concerning factor (N), the trial court found that Father had emotionally abused the Children by consistently failing to fulfill promises he had made to the Children. During trial, DCS presented ample evidence of promises made to the Children by Father and the emotional effect Father's failure to fulfill these promises had on the Children. Under the circumstances of this case, we agree with the trial court that Father's failure to fulfill the promises he had made to the Children constituted emotional abuse. Furthermore, the Children previously were adjudicated dependent and neglected. The evidence therefore preponderates in favor of the court's findings.

With respect to factor (O), the trial court determined that Father had never afforded the Children safe and stable care. Upon our careful review of the evidence, we conclude that the proof preponderates in favor of the court's finding. Concerning factors (P) and (Q), the court determined that Father had not demonstrated an understanding of the basic and specific needs of the Children to thrive or a commitment to creating and maintaining a home that would meet the Children's fundamental and specific needs. Father's actions in persistently housing several animals, some of which "destroyed" his home after the removal of the Children, reflects a significant misunderstanding or inability to understand or attempt to correct the problems causing the initial removal of the Children from his custody. We therefore agree with the trial court that Father neither understood nor committed to providing what the Children required to thrive. These findings also support the court's determination that Father's physical environment was not healthy and safe for the Children under factor (R).

Father argues that the trial court's analysis of the best interest factors placed too much emphasis on the benefits of the foster family rather than the relationship between Father and the Children and the steps Father had taken. We disagree. In the two years following the Children's removal, Father had demonstrated little urgency in seeking remedies to the conditions that led to their removal. The Children suffered from severe behavioral, mental, and educational concerns when they entered DCS custody, and Father had accomplished very little to address the special needs of the Children by the time of trial. We therefore affirm the trial court's finding by clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.

VI. Conclusion

For the foregoing reasons, we reverse the trial court's finding of the statutory ground of abandonment by failure to support. We affirm the trial court's judgment in all other respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the

Children and collection of costs assessed below.  Costs on appeal are assessed to the appellant, Stephen H., Sr.

s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE